NATIONAL BASKETBALL ASSO-
CIATION and NBA Proper-
ties, Inc., Plaintiffs,

v.

DESIGN MANAGEMENT CONSUL-
TANTS, INC., d/b/a DMC Group and
Naked Jeans; Delroy Allen; ABC
Companies; and John Does, Defen-
dants.

No. 03 Civ. 5536(NRB).

United States District Court,
S.D. New York.

Oct. 15, 2003.

Bruce P. Keller, Howard S. Hogan, De-
bevoise & Plimpton, New York City, for
Plaintiffs.

Stephen A. Wilchins, William A. De-
Vasher, Seegel, Lipshutz & Wilchins, P.C.,
Wellesley, MA, for Defendants.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiffs National Basketball Associa-
tion ("NBA") and NBA Properties, Inc.
("NBA Properties, Inc.") (collectively, the
"NBA Parties" or the "plaintiffs") seek an
order adjudging defendants Designer
Management Consultants, Inc. (originally
identified as "Design Management Consul-
tants, Inc.") (d/b/a DMC Group and Naked
Jeans) ("DMC") and Delroy Allen ("Allen")
(collectively, the "defendants") in civil con-
tempt for defendants' violations of a Pre-

liminary Injunction on Consent entered by this Court on August 11, 2003 (the "Order"). For the following reasons, plaintiffs' motion is granted.

## I. Background

Plaintiffs brought suit against defendants on July 25, 2003, raising federal claims of trademark infringement, false designation of origin, trademark dilution, and New York state claims of trademark infringement, trademark dilution, unfair competition, and deceptive acts and practices. These claims relate to defendants' manufacture and sale of certain clothing products which allegedly infringe upon plaintiffs' exclusive rights in NBA trademarks, such as those found in NBA uniform designs.[1]

Following the filing of this suit, the parties continued negotiations, which apparently commenced pre-litigation, and reached an agreement on a Preliminary Injunction on Consent, which was so ordered by the Court on August 11, 2003 (the "Order"). This Order, inter alia, enjoined defendants from manufacturing, distributing, promoting or selling apparel products which bear NBA uniform designs or derivations or imitations thereof (hereinafter, "Disputed Merchandise"[2]). The Order also required defendants to provide plaintiffs with a complete accounting of defendants' sales of Disputed Merchandise accompanied by documentation from which plaintiffs could independently calculate profits on these sales.

Plaintiff now alleges that defendants have committed several violations of the Order, and that a finding of civil contempt is warranted. Oral argument on this motion was held on September 19, 2003. It was agreed at the conclusion of the argument that the Court should refrain from decision while the parties endeavored to resolve their dispute. Following the receipt of notification that an agreement had not been reached, the defendants filed additional submissions on the contempt issue.

## II. Alleged Violations of the Order

### A. Sales of Disputed Merchandise

Plaintiffs allege that at least three separate sales of Disputed Merchandise have occurred since the issuance of the Order. Specifically, on August 13, August 19 and August 21, 2003, investigators retained by plaintiffs purchased several pieces of Disputed Merchandise from Hip Zepi[3] stores in Boston and Dorchester, Massachusetts. In addition, the investigators observed hundreds of units of what was believed to be Disputed Merchandise for sale in the stores. *See* Wielage Decl. at ¶ 3; Alvarez Decl. of Aug. 22, 2003, at ¶ 3–4; Kennedy Decl. at ¶ 2–3.

Defendants offer several responses to these allegations, which we will summarize. First, defendants contend that the purchase on August 13 occurred before

---

1. There is no dispute that defendants manufactured, marketed and sold clothing items which resembled NBA jerseys or bore NBA logos or other indicia of NBA franchises. A typical item is a women's dress which displays a NBA franchise city or state name (*i.e.* New Jersey), that franchise's team colors (*i.e.* blue and red), and the number of a well-known player on that team (*i.e.* 5, for Jason Kidd).

2. We here adopt the term used by the parties to refer to that merchandise which is alleged to infringe and dilute plaintiffs' trademarks.

3. Defendant Delroy Allen is the president, a director and minority stockholder of Hip Zepi, Inc., a Massachusetts corporation engaged in the business of selling clothing and accessories through three retail stores in the Boston area. Allen Supp. Aff. at ¶ 3. Hip Zepi is a DMC customer. *See id.* at ¶ 5.

they had adequate time to act on the Order (which was issued on August 11). *See* Oral Argument on Motion for Contempt Tr. at 9–10 (hereinafter "Contempt Tr."). Second, defendants claim there was confusion regarding the Order's parameters, resulting in part from the similarity between apparel items enjoined by the Order and those exempt from the Order. Defendants submit that the confusion caused any delay or error which allowed Disputed Merchandise to be sold subsequent to the Order. *See* Contempt Tr. at 9–13; Opp. Mem. at 5. Third, defendants question the accuracy of the investigators' observations that several hundred pieces of Disputed Merchandise were on sale throughout Hip Zepi stores after the Order. Defendants assert that given the similarity between Disputed Merchandise and permissible merchandise, it would be difficult for an observer not armed with the Order to quickly and casually perform a reliable inventory of Disputed Merchandise. Opp. Mem. at 4. Fourth, defendants seek to minimize the sales by noting that as a percentage of defendants' total sales, the number of proscribed items that remained for sale following the Order is rather insignificant. *See* Contempt Tr. at 14–15. And fifth, defendants maintain that since the third investigator's purchase of Disputed Merchandise, no such sales have been made, and that it took only ten days for all Disputed Merchandise to be cleared from the stores. *See* Contempt Argument Tr. at 10; Supp. Opp. Mem. at 2.

### B. Failure to Provide Adequate Accounting Documentation

Plaintiffs also allege that defendants' obligation to provide a complete and independently verifiable accounting of defendants' sales of Disputed merchandise remains outstanding.

The Order required defendants to produce this accounting along with documentation reasonably necessary for the plaintiffs to verify defendants' profits by August 18, 2003. Plaintiffs contend that all they have received is "a summary table of alleged profits and copies of unsupported, unexplained and therefore useless, sales invoices." Keller Letter of Sept. 29, 2003, at 2; *see also* Supp. Hogan Decl. Exs. 9, 11.

Defendants do not dispute that they did not meet the August 18, 2003, deadline. Indeed, defendant's Opposition Memorandum, submitted on September 2, 2003, states that "although DMC has not yet been able to produce the final accounting of sales and profits required by the Injunction, it has used its best efforts to comply with that requirement and believes it will be able to do so no later than September 12, 2003." Opp. Mem. at 6.

While counsel for defendants originally represented they could procure and produce an accounting by August 18, 2003, DMC's "extremely rudimentary accounting system" stalled any such endeavor. *See* Contempt Tr. at 15. At the time of the deadline, the outmoded, partially-computerized accounting system had generated a list of 1,000 relevant invoices and the invoices themselves. *See* Opp. Mem. at 6. The invoices and the list were sent to plaintiffs between August 18, 2003, and August 21, 2003. This, according to defendants, was "admittedly [not] a profit statement." Contempt Tr. at 16. Defendants contemporaneously began manually reviewing the invoices to tabulate sales and compile a profit and loss statement of Disputed Merchandise. *See id.;* Opp. Mem. at 7. On September 12, 2003, defendants sent plaintiffs the product of 250 hours of manual accounting work: an "Estimated Profit & Loss" statement for DMC, and a summary of "Sales by Product/Service"

which purports to account for sales of Disputed Merchandise. *See* Hogan Supp. Decl., Ex. 8. This, according to defendants, constitutes a profit and loss statement. *See* Contempt Tr. at 16. As of September 26, 2003, defendants maintain that they expended 300 hours of manual effort to calculate profits resulting from sales of Disputed Merchandise. *See* Supp. Opp. Mem. at 2.

Plaintiffs maintain that the summary statements of profit and sales cannot alone satisfy the Order's accounting provision, and that defendants must still provide plaintiffs with documents from which an independent verification of defendants' calculations can be conducted. *See* Keller Letter of Sept. 29, 2003, at 2.

Defendants, in response, aver that the documents supporting their calculations "are extensive, and only a minor portion of them are electronically formatted and it would be very expensive to copy and deliver them to the NBA's accountants, presumably in New York City." Allen Supp. Aff. at ¶ 21. Defendants further contend that they have offered to allow plaintiffs full access to these files. *See id.* at ¶ 20; Contempt Tr. at 16–17, 22.

### C. Promotional Activity

The Order forbids any advertising, marketing or promoting of Disputed Merchandise by defendants. Order at 2. Plaintiffs maintain, and defendants do not deny, that Boston's Channel 56 television station ran a Hip Zepi commercial on September 4, 2003, expressly advertising the sale of Disputed Merchandise.[4] *See* Contempt Tr. at 7. Defendants, however, insist that the commercial was filmed well before the Or-

der. Indeed, the commercial begins with the announcement, "It's spring again", clearly indicating that the commercial was prepared in spring of 2003.[5] *See* Contempt Tr. at 17. Mr. Allen, who personally oversees and directs Channel 56's airing of Hip Zepi commercials, affirms that he last authorized the broadcast of the commercial in June of 2003. *See* Allen Supp. Aff. at ¶ 28, 30, 32. Defendants claim that upon learning of the original commercial's continued airing, Mr. Allen immediately telephoned a Channel 56 sales representative to instruct that its broadcast cease. *See* Allen Supp. Aff. at ¶ 38. Defendants state that following the Order, Hip Zepi deleted all references to Disputed Merchandise from the commercial, and that every post-Order airing of the original commercial was not authorized by defendants. *See* Allen Supp. Aff. at ¶ 34–37.

### III. Civil Contempt

A court possesses the inherent power to hold a party in civil contempt when (1) the order the party failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the party has not been reasonably diligent and energetic in attempting to comply. *See EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Assn.,* 753 F.2d 1172, 1178 (2d Cir.1985).

Based on the foregoing facts, we find that these elements are satisfied and that defendants committed contempt by selling Disputed Merchandise after the Order's issuance, and in failing to produce to plaintiffs the necessary accounting and, to this date, supporting documentation.

---

4. The commercial was played during oral argument on this motion.

5. Defendants explain that Hip Zepi runs television commercials on Channel 56 twice each year, in late spring and late summer/early fall. This particular commercial was the spring of 2003 installment. *See* Allen Supp. Aff. at ¶ 26, 31.

There appears to be no genuine dispute that the provisions in question, which were agreed to by the defendants, are clear and unambiguous, and that they were violated. An order is "clear and unambiguous" where it is "specific and definite enough to apprise those within its scope of the conduct that is being proscribed" or required. *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir.1989). Delays in complying with the Disputed Merchandise provisions of the Order resulted not from any defect in the Order,[6] but rather, as defendants concede, from mistake, error and a lack of vigor or urgency on the part of defendants and those persons directed by defendants to effect full and immediate compliance with the Order.

Defendants do not deny that some units of Disputed Merchandise were purchased. *See* Contempt Tr. at 9. Rather, defendants aim to downplay the aggregate sales of Disputed Merchandise subsequent to the Order. Yet the Order itself does not permit *any* sales of Disputed Merchandise. Furthermore, defendants do not deny that the NBA's investigators might have observed hundreds of units of Disputed Merchandise in the Hip Zepi stores; instead, defendants only attack the ability of the investigators to reach that conclusion. *See* Opp. Mem. at 4–5; Allen Aff. at ¶ 29–30.

With respect to the accounting, the record shows, with abundant clarity, that neither the accounting nor supporting documentation was given to plaintiffs in satisfaction of the August 18, 2003, deadline. And as of this date, it is equally clear that the supporting documentation remains undelivered.

There is, however, dispute as to whether defendants discharged their obligation to comply with reasonable diligence. This Court has held that "compliance must be beyond the realm of possibility, not just difficult to achieve, before a party will be exonerated in a contempt proceeding." *Barcia v. Sitkin*, 79 Civ. 5831(RLC), 79 Civ. 5899(RLC), 1997 WL 66785, *2 (S.D.N.Y. Feb. 14, 1997). *See also Badgley v. Santacroce*, 800 F.2d 33, 36–37 (2d Cir.1986) (holding that compliance must be a factual impossibility before a party's noncompliance is excused).

Defendants maintain that they exercised reasonable diligence with respect to the Disputed Merchandise. *See* Allen Aff. at ¶ 31. We disagree. That reasonably, if not easily, avoidable violations occurred ten days after the Order's entry indicates that defendants did not "explore[ ] every avenue for [compliance]." *Barcia*, 1997 WL 66785 at *2. For example, defendants have not presented the Court with evidence that an effective or specific set of instructions was issued to those persons directed to remove Disputed Merchandise from sale. If defendants were in fact confused as to which products were prohibited and which were not, defendants could have removed *all* questionable items from sale as an expeditious solution, or at a minimum made inquiry to plaintiffs' counsel or brought any dispute to the Court. This would have represented diligence commensurate with the task. For these reasons, we find that defendants did not employ reasonable diligence and energy with respect to the Disputed Merchandise.

Defendants maintain that they have been appropriately diligent with respect to the accounting. We again disagree. While it appears that defendants' counsel, in good faith, promised more than could be delivered within the deadline set out by

---

6. The Order left no doubt as to which items were proscribed. The Order included full-color photographs and drawings of the items within its reach, many of which were provided by defendants themselves. *See* Order, Ex. A.

the Order with respect to the accounting, defendants' continued failure to provide plaintiffs with documentation supporting their profit and sales calculations inexcusably violates the Order. Defendants' offer that plaintiffs may travel to Boston to review their accounting documents is woefully insufficient. While defendants contend that copying and shipping the documents to plaintiffs would be "very expensive", that is a cost that defendants agreed to bear under the Order.

■ Finally, we do not believe the post-Order running of the Hip Zepi commercial constitutes contempt. While its broadcast undoubtedly violated the Order, we are persuaded that defendants acted with proper diligence in ensuring its removal from the airwaves.

## IV. Sanctions

■ Sanctions for contempt are meant to coerce compliance or compensate loss. *See, e.g., New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir.1989).

■ A coercive fine is appropriate at this juncture. Defendants are ordered to pay the Clerk of Court $2,500 for each day of noncompliance after October 15, 2003. Specifically, defendants must provide plaintiffs the accounting and supporting documentation required by the Order. Though we have no reason to believe that defendants remain in possession or control of any Disputed Merchandise, we emphasize that any further violation of the Order's Disputed Merchandise provision is equally subject to this fine.

In addition, plaintiffs are entitled to the net profits defendants earned from selling Disputed Merchandise in violation of the Order. *See Manhattan Idust., Inc. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1, 7 (2d Cir.1989) (finding that plaintiff is "entitled to those profits derived by [defendant] from the unlawful sales of [defendant's infringing] merchandise [for] the period in which [defendant] was in civil contempt of the district court's consent judgment"). We note that it is the contemnor's burden "to prove any deductions for its costs from the gross revenues attributable to its contempt" in order to arrive at the net result. *Id., quoting Oral–B Laboratories, Inc. v. Mi–Lor Corp.*, 810 F.2d 20, 26 (2d Cir. 1987). The damages figure will be quantified upon the final resolution of this matter.

## Conclusion

Plaintiffs' motion to hold defendants in civil contempt is granted. Defendants will be jointly and severally fined $2,500 for each day they fail to comply with the Order after October 15, 2003. Plaintiffs are entitled to defendants' net profits earned in violation of the Order. Such profits will be determined upon the final resolution of this matter. A pretrial conference is scheduled for October 29, 2003, at 3:30 p.m., in Courtroom 21A, 500 Pearl Street.

**IT IS SO ORDERED.**